## Greasy Creek Coal and Land Company, et al. v. Greasy Creek Coal Company.

(Decided October 13, 1922.)

### Appeal from Bell Circuit Court.

1. Receivers—Restriction Upon Power of Appointment.—Section 298 of the Civil Code of Practice, authorizing the appointment of a receiver at the instance of one who has, or probably has, a right to a lien upon or an interest in any property or fund, restricts the power of appointment to cases in which the property or fund is in danger of being lost, removed or materially injured.

2 Receivers—Exercise of Power of Appointment.—The power of appointing a receiver should be exercised with great caution, and never indulged unless the danger of loss or injury to the property in controversy is imminent, and the one seeking the receivership has no other adequate remedy.

3. Receivers—Appointment—Evidence.—On the evidence in this case, held that the appointment of a receiver was not reasonably necessary to protect the interests of the plaintiff, at whose instance the appointment was made.

JAMES H. JEFFRIES for appellants.

W. T. DAVIS and T. G. ANDERSON for appellee.

OPINION OF THE COURT BY JUDGE MOORMAN—Reversing.

This is an appeal from an order of the circuit court of Bell county, appointing a receiver, under section 298

of the Civil Code, to take charge of and operate certain mining properties, the subject of this litigation, in that county.

The Greasy Creek Coal Company filed a petition, in the Bell circuit court, against the Greasy Creek Coal and Land Company, Boone Jellico Coal Company, and others, appellants herein, wherein it was alleged that by virtue of a lease of March 19, 1913, appellee was entitled to the possession of the leasehold and mining equipment on approximately five hundred acres of land in Bell county, then held by appellants; that appellants had wrongfully entered upon and taken possession of the property, and the Boone Jellico Coal Company, an insolvent corporation, was operating it, and would squander, dissipate, depreciate and render the property valueless if permitted to continue to operate it.

By answer appellants denied the material averments of the petition, and asserted a counterclaim, aggregating $56,247.50. But so far as this appeal is concerned, the only question for consideration is whether or not the record, consisting of pleadings, exhibits, and the oral evidence heard on the motion for a receiver, justifies the action of the trial court in appointing a receiver, and directing him to operate the property and conserve the profits therefrom for distribution according to the rights of the parties as they may hereafter be determined in this litigation.

It is shown in the evidence that much of the coal under the property had been mined at the time the Boone Jellico Coal Company acquired possession of it, and it is estimated that there is now not exceeding one hundred thousand tons of mineable coal in the land. It is also to be concluded from the facts proven that, except during periods of scarcity of coal and abnormally high prices, the coal that is now there is not susceptible of profitable mining.

The rights asserted by appellee depend on a chain of leases beginning in 1910. At that time W. T. Murray was the owner in fee of a large boundary of coal land, including the land in dispute, and in August of that year he executed and delivered to R. B. Baird a lease on the land in controversy here, for a period of fifty years. Shortly thereafter R. B. Baird assigned and transferred the lease to the appellee, Greasy Creek Coal Company.

Within the same year, Murray sold and conveyed to the Greasy Creek Coal and Land Company all the coal lands embraced in the lease mentioned, as well as a considerable boundary of other lands adjoining it. On March 19, 1913, the Greasy Creek Coal and Land Company executed and delivered to the appellee, Greasy Creek Coal Company, a coal mining lease on the 500 acres, for a period of forty-seven years, and also on an additional acreage adjoining it, which the Greasy Creek Coal and Land Company had acquired, as hereinbefore stated, from W. T. Murray.

It was provided in the lease of March 19, 1913, that appellee should pay the lessor, Greasy Creek Coal and Land Company, as rent and royalty for the coal mined on the leased premises, $13\frac{1}{2}$ cents a ton of two thousand pounds mine run, when taken from what is known as the Dean seam, and 11 cents a ton of two thousand pounds when taken from any other seam; and further, beginning August 1, 1913, the lessor should be paid this royalty on a minimum of three thousand tons a month for the first calendar year, for the second calendar year on a minimum of five thousand tons a month, for the third year on a minimum of six thousand tons a month, and thereafter. during the life of the lease, on a minimum of seven thousand tons a month, or eighty-four thousand tons a year. It was also agreed that at the expiration of the lease the property should be surrendered to the lessor with improvements, fixtures, buildings and dwellings thereon, and with all the mines, openings, tramways, inclines, chutes, tracks, rails, appurtenances, inside and outside the mines, in good working order and condition, but the working tools and instruments used in mining, machinery, engines, pulleys, pumps, ropes, weighing scale, and other property placed on the premises by the lessee, should be and remain the property of the lessee, and might be removed by it if all rents and royalties were paid, and the agreements of the lease fully complied with. The lessee covenanted and agreed, that should it fail to pay the rents and royalties provided for in the lease, at the time and the place therein specified, and remain in default for a period of ninety days thereafter, at the option of the lessor the lease should be forfeited, and all rights and privileges thereunder should cease and terminate, and the lessor, and its officers, agents or assigns, might enter on the lease and take possession of the prem-

ises, with the appurtenances, to the same extent as it might do at the expiration of the full term of the lease.

On March 1, 1916, the Greasy Creek Coal Company sublet to the Pine Ridge Coal Mining Company its properties acquired under the lease from the Greasy Creek Coal and Land Company. Under the terms of that lease the Pine Ridge Coal Mining Company agreed to pay to the Greasy Creek Coal Company twenty cents a ton on all coal mined up to eighty-four thousand tons per annum, from and after August 1, 1916, and on all coal mined in excess of eighty-four thousand tons per annum the royalty should be fifteen cents; and it was further agreed that the minimum royalty should be not less than six thousand tons a month, at the rate of twenty cents a ton, and these royalties were to be paid on the 15th day of each month for all coal mined during the preceding month. The Pine Ridge Coal Mining Company caused to be executed and delivered to the Greasy Creek Coal Company a bond in the penal sum of five thousand dollars, for the faithful performance of the conditions of this agreement. The lessee company took possession of the leasehold, and operated it for a while, but defaulted in the payment of royalties, and suit was then brought against it by the Greasy Creek Coal and Land Company for a cancellation of the lease. An adjustment of that suit was made, and in the settlement the Greasy Creek Coal and Land Company, the owner of the property, its lessee, the Greasy Creek Coal Company, the appellee herein, and the Pine Ridge Coal Mining Company, the sub-lessee, on January 7, 1920, entered into a tri-partite agreement, under which the Pine Ridge Coal Mining Company agreed to and did pay to the Greasy Creek Coal and Land Company $2,500.00 in settlement of rents and royalties due that company to August 31, 1919. All the terms, stipulations, covenants and agreements in the lease between the Greasy Creek Coal and Land Company and the Greasy Creek Coal Company, of date March 19, 1913, were made a part of the tri-partite agreement, except for certain modifications, among which were; first, that portion of the property described in the lease of March 19, 1913, known as the "upper tract," was released and turned back to the Greasy Creek Coal and Land Company; second, commencing January 1, 1920, the Pine Ridge Coal Mining Company agreed to pay the Greasy Creek Coal and Land Company, irrespective of the coal mined, a yearly rental of three thousand tons per month,

mine run, or thirty-six thousand tons per year, that being the fixed minimum royalty; and, third, it further covenanted and agreed to pay a royalty of 23½ cents a ton of two thousand pounds mine run on all coal mined and removed, payment to be made on the 15th day of the month, for the coal mined during the preceding month. 13½ cents of this royalty was to be paid direct to the Greasy Creek Coal and Land Company, and the remaining 10 cents to the Greasy Creek Coal Company.

The Pine Ridge Coal Mining Company appears to have operated the property thereafter until December, 1921. However, it continued to pay the Greasy Creek Coal Company its minimum royalty of $300.00 a month until the 23rd day of March, 1922, which royalty was not provided for in the contract of January 7, 1920, though it is admitted that it was intended to be included therein. But it ceased paying the monthly minimum royalty of $405.00 to the Greasy Creek Coal and Land Company in October, 1921. It appears from the record that the equipment at the mine was, when the acts complained of by appellee occurred, in a very dilapidated condition. On February 24, 1922, the Pine Ridge Coal Mining Company notified the appellee and the Greasy Creek Coal and Land Company that it would no longer operate the lease. R. M. Cornett, the president and general manager of the Greasy Creek Coal Company, received the notice, but seemingly did nothing about it until the following May, when he went to Lexington, Kentucky, to see W. W. Estill, president of the Greasy Creek Coal and Land Company. They met by appointment in a hotel at Lexington, and Cornett offered to lease the property from the Greasy Creek Coal and Land Company on a ten per cent royalty basis, organize a company to operate it, and pay to the Greasy Creek Coal Company a like royalty. Estill refused to make such an arrangement, informing Cornett that his company had received no royalties for nearly a year, and that no one should mine any more coal on the property until the back royalties were paid. A. G. Patterson was the agent of the Greasy Creek Coal and Land Company at Pineville, and it is in proof that at that time, or perhaps earlier, his company had been notified that the insurance carried by the Pine Ridge Coal Mining Company had expired. He inquired of Cornett, as president of the Greasy Creek Coal Company, if his company would make any arrangement with reference to continuing the insurance. About the same time the two com-

panies were notified that the railroad company would discontinue the spur connection to the mine unless the spur track was repaired, and Patterson also demanded of Cornett that his company alone, or in conjunction with the Greasy Creek Coal and Land Company, make arrangements to continue the insurance and to repair the spur track. Patterson testified positively that Cornett declined to take any action, and stated unequivocally, not once but repeatedly in different conversations, that he and his company were through with the leasehold, and would have nothing more to do with it. Not only is that true, but it is shown that Patterson told Cornett that he had taken some parties to see the property, and was trying to make some arrangement by which he could get some one to operate it, and Cornett, in reply, stated that such a course was thoroughly agreeable to him and to the Greasy Creek Coal Company. Having failed to enlist the interest of appellee in preserving or operating the leasehold, the Greasy Creek Coal and Land Company, on June 15, 1922, leased the property to Patterson, as trustee, on a royalty basis of 23½ cents a ton on all coal mined and removed from the premises, and under the terms of the lease the trustee agreed to put the railroad siding and spur tracks in good condition, and to make other repairs on the property. It was stipulated that Patterson should not have the right to transfer the lease, but that he might organize a corporation with sufficient capital to operate it. The Boone Jellico Coal Company was then organized, and, between that date and the filing of the petition in this suit, July 29, 1922, it expended about $6,000.00 in improving the property, by adding new equipment, repairing the tramways and spur track, and making other repairs necessary to operate it. It does not even appear that Cornett or the Greasy Creek Coal Company did not know that the Boone Jellico Coal Company was making these expenditures, and it is repeatedly stated in Patterson's testimony, and not directly or satisfactorily denied in the statements of Cornett, that the latter said on more than one occasion that the appellee had finished with the property, and would have nothing more to do with it, but expected to look to the bond of the Pine Ridge Coal Mining Company to protect such rights and interest as it had.

An inventory of equipment is filed in the record, purporting to show about $50,000.00 worth of property on the leasehold when it was surrendered by the appellee to

the Pine Ridge Coal Mining Company. In this inventory there are listed miners' cabins of the value of $8,800.00, the leasehold right at $10,000.00, and fixtures and other buildings of a permanent nature, which, under the contract, reverted to the lessor at the termination of the lease. The inventory taken by the Pine Ridge Coal Mining Company, when it surrendered the lease, amounted to $74,000.00, inclusive of a spur appraised at more than $14,000.00, and the leasehold at $10,000.00, together with buildings and other permanent structures that passed to the lessor on the abandonment of the lease. Because of these items, as well as others listed but in nowise proven, we do not regard the inventories as furnishing anything like a fair criterion of values. Besides, it is in evidence, and convincingly so, that all of the equipment was dilapidated and much of it useless, and that all the property that the lessee was entitled to remove, under the terms. of either lease, provided the royalties were paid, would not amount to so much as the value of improvements and new equipment placed on the leasehold by the Boone Jellico Coal Company.

It is contended for the appellee that the lease of March 19, 1913, was a part of the terms of the tri-partite agreement of January 7, 1920, and when the latter was abandoned the former was reinstated, except as modified by the latter, the modifications relating almost exclusively to the royalties to be paid. If the proposition be sound, and it may be admitted that it is for the purposes of this hearing, it follows that the minimum royalty provision of seven thousand tons a month was abrogated by the tri-partite agreement. But it does not follow that appellee could retain the benefits of its lease without rendering some consideration to its lessor, for justice and fairness would not permit the holding of the property, after the abandonment of the agreement of January 7, 1920, without the payment of reasonable rents and royalties therefor; and, conceding that appellee had the right, when the agreement of January 7, 1920, was abrogated, to take possession of and retain the property under the agreement of March 19, 1913, good conscience would require it to pay a reasonable rental on the property, otherwise the very purpose of that lease would be destroyed, and there would be no consideration for the rights asserted by the appellee. In that state of case, equity would require that the Greasy Creek Coal Company perform some service or pay some rental in consideration for its retention of the

rights under its lease, and the evidence shows that the company refused to pay any rent or do anything to hold the property intact or preserve it.

The rights of appellee, with respect to any property that belonged to it on the leasehold, when the lease of January 7, 1920, or the one of 1913, was abrogated, if it is finally determined that there was such property, may be protected, since the evidence shows that the Greasy Creek Coal and Land Company is solvent. If it leased the property with any equipment thereon belonging to other parties, thereby converting the equipment, it is responsible to the extent of such conversion, and a recovery therefor may be had. Those questions may yet be determined in this case. But it is not shown by the evidence that the Boone Jellico Coal Company has damaged or will damage the property. On the contrary, it has improved the property, and it, too, can be held liable for the damage that it does to any equipment rightfully belonging to the appellee. The taking of coal from the property by the Boone Jellico Coal Company is not an infringement on any right of the appellee, because that company has declined to operate, and has announced, through its responsible officer, that it will not operate, thus abandoning any right it may have had to mine coal on the lease.

Under section 298 of the Civil Code, the power to appoint a receiver, at the instance of one who has, or probably has, the right to a lien upon or an interest in any property or fund, exists only where the property or fund is in danger of being lost, removed or materially injured. This provision of the Code is a limitation on the power of the courts, and it has been uniformly held thereunder that the one seeking the appointment must show one of the three conditions mentioned, that is, that the property is in danger of being lost, or of being removed, or materially injured. Whatever inherent power of appointment a court of equity may have, the legislature, in the adoption of this provision of the Code, has defined the states of case in which the power can be lawfully exercised. Aside from this defined and restricted authority, it is the general rule that a receiver will not be appointed unless it appear that the appointment is necessary either to prevent fraud, or to save the property from injury or threatened loss or destruction. 23 R. C. L. 18. The fact that the appointment will do no harm will not of itself authorize such action by the court. These principles

were recognized by this court in Elkhorn Hazard Coal Company v. Fairchild, 191 Ky. 276, where we pointed out that the appointment of a receiver is a provisional remedy, "the last of that sort of remedies to be resorted to," and not justifiable when the plaintiff has another adequate remedy. The same rules are enunciated in Pomeroy's Equity Jurisprudence, 4th edition, section 1484, *et seq.*, where it is said that the power should be exercised with great caution and never indulged unless the danger of loss or injury is imminent.

Conceding, therefore, that appellee has an interest in some of the property, a question that we do not decide, if it has failed to show that the appointment of a receiver was reasonably necessary to protect its interests, the order should not have been made. With this view of the right to a receivership, we have carefully examined the evidence, and it is our conclusion that there has been no showing of any danger of injury, loss or damage to appellee's rights on account of the operations of the Boone Jellico Coal Company.

The judgment is reversed and cause remanded for proceedings not inconsistent with this opinion.