## Greasy Creek Coal and Land Company, et al. v. Greasy Creek Coal Company.

(Decided June 12, 1928.)

### Appeal from Bell Circuit Court.

1. Contracts.—Contract must be construed reasonably and to effectuate the real intention of parties.
2. Mines and Minerals.—Contract by which lessee of coal mine agreed that personalty placed on premises by lessee only remained his property, in case all rents and royalties were paid and agreements of lease fully complied with made such personalty part of the mine, and on lessee's insolvency and surrender of property lessor could take charge of property, preserve it, and make another lease covering such personalty without being guilty of conversion thereof.
3. Trover and Conversion.—Acts rightfully done do not constitute a conversion.

JAMES H. JEFFRIES for appellants.

W. T. DAVIS for appellee.

Opinion of the Court by Commissioner Hobson—
Reversing.

This is the second appeal of this case. The facts are
stated fully in the former opinion, Greasy Creek Coal &
Land Co. v. Greasy Creek Coal Co., 196 Ky. 67, 244 S.
W. 85. On the former appeal the circuit court had ap-
pointed a receiver to take charge of the property, and
this court held that the order putting the property in the
hands of a receiver was unwarranted. No other question
was presented to the court on that appeal, for the circuit
court had entered no judgment except an order appoint-
ing a receiver, and on appeal this court had no other ques-
tion before it. On the return of the case to the circuit
court proof was taken and on final hearing the circuit
court entered judgment fixing the value of the property
of the Greasy Creek Coal Company in controversy at
$18,147.78, and the amount of the royalty due at $2,550,
leaving a balance of $15,597.78, for which judgment was
given against the Greasy Creek Coal & Land Company.
The latter appeals.

The facts briefly put are these: W. T. Murray, who
then owned the land, in 1910 leased the boundary in con-
troversy to R. B. Baird. Baird assigned the lease to the
Greasy Creek Coal Company (hereafter called the coal
company) and soon thereafter he sold the entire tract of
land to the Greasy Creek Coal & Land Company (here-
after called the land company), which thus became en-
titled to the royalties and all Murray's rights under the
original lease, and it then made an additional lease to
the coal company. On March 1, 1916, the coal company
sublet its property acquired under above leases to the
Pine Ridge Coal Mining Company (hereafter called the
Pine Ridge Company). On January 1, 1920, a tripartite
agreement was made between the three companies by
which certain settlements as to royalties were made.
Things ran along until February 24, 1922, when the Pine
Ridge Company, being insolvent and no longer able to
operate the lease, gave it up and gave notice to this effect
to both the coal company and the land company. The
coal company refuses to do anything or to take any steps.
Things thus ran along for a while and the land company
took possession of the property. It was in bad repair.
The railroad company was threatening to take out the
spur tracks and the land company to protect itself finally

made a contract by which it leased the mine to A. G. Patterson, as trustee, and he organized the Boone-Jellico Coal Company (hereafter called the Boone Company), which then took charge of the property under a contract made between it and the land company, by which it agreed to pay certain royalties, and the land company delivered to it, not only the possession of the land, but all of the machinery, etc., which the Pine Ridge Coal Company had left there when it abandoned the property. This personal property is that for which the circuit court gave the judgment above indicated, and the judgment rests upon the ground that all this property had been converted by the land company in the above transaction with the Boone Company. The rights of the parties turn on the proper construction and effect of the written contracts between them. The original lease made by Murray, after providing for the payment of certain royalties, contained these provisions:

"The lessee further covenants and agrees at the expiration of this lease to leave and surrender to the lessor the premises, herein demised, with the improvements, fixtures, buildings, and dwellings thereon, and with all the mines, entries, openings, tramways, inclines, chutes, tracks, rails, and appurtenances inside and outside the mines, in good working order and condition, but on such termination, the working tools and instruments used in mining, machinery, engines, boilers, pumps, ropes, and weighing scales, and other personal property placed upon said premises by the lessee shall be and remain the property of the lessee in case all rents and royalties be paid and agreements of this lease fully complied with, provided, however, and the lessee covenants and agrees that the lessor shall have the right and preference to purchase at an appraisal at fair market value all or any of the machinery and other personal property of the lessee above allowed to be removed, should the lessor desire to do so at the expiration or sooner upon the termination of this lease in lieu of the allowing removal.

"The lessee further covenants and agrees that should the lessee fail to pay the rents and royalties, or either of them provided for at the time and place hereinafter specified, and should continue in such default for a period of ninety days thereafter, or

shall fail to comply with the terms and conditions of this lease upon its part for a period of ninety days, upon the option of the lessor the lease will become forfeited and become null and void, and all rights and privileges of the lease shall cease and terminate and the lessor or its officers, agents, or assigns may enter thereupon and take possession of said premises with the appurtenances and in the same manner and to the full extent, as the said lessor might or could do at the expiration of the full term of the lease herein. . . .

"In the event of such termination of this lease by the lease the lessee shall have the right to remove within three months from the premises all the coal and coke which may have been mined and made by the lessee previous to the termination of this lease by paying the rents and royalties thereon, and shall also have the right to remove within three months if not bought by the lessor the working tools, machinery, and other personal property which the lessee may have put upon the premises as above provided for at the expiration of this lease, but before actually removing this property from said premises the lessee shall put the mines in good working order as above stipulated, and shall pay all rents and royalties which are unpaid."

The contract between the land company and the coal company, made March 19, 1913, after referring to the Murray lease and fixing the minimum royalties to be paid, contained verbatim the same provisions as above quoted from the Murray lease.

When the coal company leased to the Pine Ridge Company, after referring to the Murray lease, it provided:

"The said second party undertakes to carry out and perform all the conditions set out in said lease. and is to be governed by the conditions therein, as fully and completely as if it were a party thereto.

"It is further understood and agreed between the parties hereto that at the termination of this lease any personal property or mining equipment, over and above the articles necessary to replace the inventory attached hereto, belonging to the second party, it shall have the privilege to remove the same

from the premises, provided that all the rents and royalties and other indebtedness shall have been fully paid."

The contract of January 7, 1920, between the three companies fixed the rate of the royalty to be paid each company, but made no change in the existing contract, except that the second tract leased by the land company to the coal company was turned back to it. That contract contained these words:

"All of the terms, stipulations, covenants, and agreements in the said lease between the Greasy Creek Coal & Land Company and the Greasy Creek Coal Company dated March 19, 1913, and recorded in Lease Book No. 5, page 188 to 195, inclusive, Bell county court clerk's office, are made a part of this agreement and contract as though set out in full herein, save and except as to the following modifications."

It will be observed that by the Murray lease the lessee agreed that upon the expiration of the lease he would surrender to the lessor the mine in good working order, and further agreed that the mining machinery, engines, etc., which constituted the property here in controversy, placed upon the premises by the lessee, should be and remain the property of the lessee in case all rents and royalties were paid and the agreements of the lease fully complied with. The contract creates more than a lien upon the property. By its terms the personal property placed upon the premises by the lessee only remained his property in case all rents and royalties were paid and the agreements of the lease were fully complied with. This is brought out very fully in the contract; for it is in another place provided that the lessee shall have the right to remove within three months the working tools, machinery, etc., but before removing the property from the premises the lessee shall put the mines in good working order and shall pay all rents and royalties which are unpaid. These provisions of the original lease are carried through and made a part of the subsequent contracts. The reason for it was this: The coal mine could only be operated with cars, engines, drills, compressed air, electricity, etc. These things put into the mine were an essential part of the plant and the plain purpose of the contract was that they could not be removed until the

contract was complied with. In other words, this contract made these things part of the mine and took them out of the rules regulating other personal property. When the Pine Ridge Company became insolvent and surrendered the property and left this personalty there, the land company as the lessor, had a right to take charge of the property, preserve it, and make another lease covering, not only the land, but the equipment so as to protect itself. The coal company, who had sublet, although given ample opportunity to protect its lessor, took no steps. The only proposition that was made was by its president that he individually would take a lease and pay the land company its royalty on so much coal as he got out. There was no proposition to pay the royalties in arrear, and no proposition to protect the lessor in its contract with the lessee. The lessor was left to protect itself. In making the contract with the Boone Company it did not exceed its legal rights; for the provisions of the contract that this personalty could not be removed until the mines were put in good order and all rents were paid disabled the coal company under the existing conditions from asserting any right to the possession of this property, and under the conditions existing the steps which the land company took were clearly within the natural meaning and effect of the contracts under which this property had been placed in the mines. The land company did not sell the property; it only gave its lessee the right to use it in the mine. It simply leased this property and the mine to the Boone Company and the latter agreed to turn over the property in good condition at the end of the lease. Without a right to make such a lease the provisions of the contract aimed for its protection would be no protection at all under the conditions here presented. The contract must be construed reasonably and to effectuate the real intention of the parties. Thus construed the common-law doctrine of conversion has no application here. The purpose of the contract in providing that the equipment should not be removed unless the lessee had performed the contract and left the property in good condition was to enable the lessor to make a new lease treating this equipment as part of the plant. Appellant only did what it had a right to do. Acts rightfully done do not constitute a conversion.

There is no equity in appellee's case. If it is conceded that the personal property in controversy was of value $18,000, it also stands conceded that the mine was

left in a most deplorable condition, and that the Boone Company spent over $20,000 upon it in righting things up. The proof does not show that all the property named in the invoice was received by appellant or its lessee, the Boone Company. Much of it was worn and out of repair. On all the evidence the court concludes clearly that the valuation fixed by the circuit court is too high; the amount due appellant on the royalties, plus the necessary expenses in putting the mine in good condition, fully equaled the fair market value of this personal property; and upon the whole case no judgment is warranted in favor of appellee against appellant; for on an equitable accounting between lessor and lessee nothing is due to the lessee.

Judgment reversed, and cause remanded for judgment as above indicated.